IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
JUN 05 2019
Clerk, U.S. Courts
District Of Montana
Missoula Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MONWELL DWIGHT BOOTH,<br><br>Defendant. | CR 19–27–BLG–DLC<br><br>ORDER |

Before the Court is Defendant Monwell Dwight Booth's Motion to Suppress (Doc. 19). Booth is charged with being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 1 at 1.) Booth seeks to suppress evidence of the firearms and ammunition that provide the basis for his indictment on the grounds that the police officers who recovered the evidence lacked justification to perform the search without a warrant. (Doc. 20 at 4–6.) The Government opposes this Motion. (Doc. 24.) For the following reasons, the Motion will be denied.

## Factual Background

On November 10, 2018 at approximately 4:11 p.m., the Billings Police Department received an emergency phone call reporting a burglary at Booth's residence. Upon contact, dispatch was told that someone had "broken into my

-1-

neighbor's home and no one is there, they kicked the door right in." Booth's neighbor, Scott Byykkonen, had been informed by an unknown individual that someone had been seen breaking into Booth's home. Byykkonen informed dispatch that the individual claimed to have seen the burglary occur but stated that he was not "sticking around" and drove away from the scene. Byykkonen called 911 after confirming that someone had broken in through Booth's back door, sticking his head inside, and yelling "hello." Byykkonen told dispatchers that no one was around. Byykkonen also informed dispatch that he did not know whether the individual was responsible for the burglary. Billings Police Officers Stovall and Adams reported to the scene.

At the scene, the officers met Byykkonen, who led them to the rear door of Booth's residence which had been left open with a panel missing and glass broken around it. Byykkonen told the officers that he was "unsure if there was anyone else inside the residence." (Doc. 20-2 at 2.) The officers announced themselves and entered the home to see if anyone was hiding inside. The officers began on the first floor and proceeded upstairs after finding that it was clear. While clearing an upper-story bedroom, Officer Stovall reported seeing "two Glock pistols and [an] AR-15 rifle sitting on a shelf in the closet. There were also several AR-15 magazines sitting halfway out of a safe next to the firearms." (*Id.*) Officer Adams

also reported observing "multiple one[-]dollar bills in a dresser drawer and [on the] floor of the bed room." (Doc. 20-3 at 2.)

After establishing that no one was in the home, the officers successfully made phone contact with Booth, who was "not . . . very concerned" about the burglary and not interested in pursuing any charges. (Docs. 20-2 at 2; 20-3 at 2.) Outside, the officers met Samie Nava, Booth's friend, who stated that she was going to watch Booth's house until he could come home. Nava confirmed that the officers had checked to make sure no one was in the home before going inside herself. (Doc. 20-2 at 2.)

Officer Adams found Booth's reactions odd, so he checked into Booth and discovered that he was on state supervision for a violent felony. Based on this information, Officer Stovall contacted Probation and Parole Officer Baxter, who was supervising Booth and advised that he was a prohibited person. Officer Baxter requested that the firearms be confiscated and that the officers perform a search of the residence. During the search, the officers found illegal substances, drug paraphernalia, ammunition, and several holsters. In total, the officers confiscated the following firearms and ammunition:

> [A] Glock, model 22, .40 caliber semi-automatic pistol, . . . a Glock, model 19, 9mm caliber semi-automatic pistol, . . . a Ruger, model AR556, 5.56 caliber semi-automatic rifle, . . . magazines for each

firearm. . . . 850 rounds of .223 caliber [ammunition], 49 rounds of .40 caliber [ammunition,] and 50 rounds of 9mm caliber [ammunition].

(Doc. 20-4 at 3.)

## DISCUSSION

Booth asserts that all evidence of firearms and ammunition must be suppressed because Officers Stovall and Adams entered and searched his home without a warrant and without the necessary probable cause and exigent circumstances to justify doing so. Additionally, Booth claims that, once in his home, the officers went beyond the scope of any permissible search when they looked inside the upstairs closet.

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Accordingly, "the government bears the burden of showing that a warrantless search . . . falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). The government must meet its burden by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

One such exception is for the existence of exigent circumstances. When, as here, the government relies upon the exigent circumstances exception, it "must

-4-

satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *Hopkins v. Bonvicino*, 573 F.3d 752, 766–67 (9th Cir. 2009) (internal quotation marks and citation omitted). The Court addresses these requirements in turn.

## I. Probable Cause

A search is supported by probable cause when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.* at 767 (internal quotation marks and citations omitted). "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (internal quotation marks and citation omitted) (emphasis in original).

Booth argues that the officers did not have probable cause to enter his home because they had been informed by Byykkonen prior to arrival that the back door had been broken in, that he had not personally witnessed it happen, that a potential witness had left the area, and that Byykkonen had "checked the house and no one

was inside." (Doc. 20 at 7.) The Court disagrees that these facts defeat a finding of probable cause.

First, the information the officers received prior to arrival at the scene is precisely what established probable cause. They had been informed that an unknown individual had forcibly entered the rear door of Booth's residence while he was away, that an eyewitness had fled the scene, and that a neighbor confirmed that the rear door had been broken into. These facts were then confirmed immediately upon their arrival when they met Byykkonen and found the rear door of Booth's residence ajar with signs of forced entry. These circumstances, viewed objectively, firmly indicate that a burglary had either recently been completed or was currently underway.

Second, it was not clear whether the burglar remained within the residence. Byykkonen only stated that he had stuck his head inside the door and yelled "hello" but that "no one was around." This is a far cry from ensuring that whoever had broken into the home was not hiding somewhere inside. Indeed, when Officer Stovall arrived on scene he noted that Byykkonen was "unsure if there was anyone else inside the residence." (Doc. 20-2 at 2.) This is not a case in which an eyewitness could attest to seeing the burglar leaving the scene of the crime so that law enforcement could be certain that the crime had already been completed and

that there was no further chance of apprehending the perpetrator during the commission of the crime. Instead, officers only knew that someone had been seen forcibly entering the home, which was confirmed by evidence at the scene, and that the only person who had dared try to make contact with the perpetrator had merely peeked his head in the door and yelled "hello." Viewed objectively, these circumstances justify a belief that a burglary had been committed and that the perpetrator may still have been within the residence.

Lastly, there is no indication that some great span of time had lapsed between the burglary and the time when the officers responded. Booth has not asserted that the officers were lackadaisical in their response and this is not a case in which the burglary was discovered the morning after or even an hour after its occurrence. Instead, the 911 call was initially placed by Byykkonen's girlfriend while Byykkonen was talking with the unknown witness who had just seen the break-in and the call was completed by Byykkonen as soon as he had confirmed what the unknown witness had claimed—that the rear door to Booth's home had been forcibly entered. Byykkonen had talked with the witness only "two minutes" before talking to dispatch. The responding officers promptly arrived at the scene with directions from dispatch to "check the area, check into that residence, and swing by and talk with [Byykkonen]."

Based on these facts, the officers could reasonably conclude that Booth's home had recently been burglarized and that the perpetrator could still possibly be in the residence. In other words, the known facts and circumstances were sufficient for the officers to reasonably believe that a crime had been committed and that evidence of that crime, or potentially the perpetrator himself, could be found within. Accordingly, the Court finds that probable cause existed in this case.

## II. Exigent Circumstances

Exigent circumstances are defined as those circumstances leading a reasonable person to believe that entry is "necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Fisher v. City of San Jose*, 558 F.3d 1069, 1086 (9th Cir. 2009) (internal quotation marks and citation omitted). Exigencies must be viewed "from the totality of the circumstances known to the officers at the time of the warrantless intrusion." *United States v. George*, 883 F.2d 1407, 1412 (9th Cir. 1989) (internal quotation marks and citation omitted). Additionally, because exigent circumstances "necessarily imply that there is insufficient time to get a warrant," the government must show "that a warrant could not have been obtained in time." *Id.* (internal quotation marks and citations omitted).

Booth asserts that there were no exigent circumstances in this case because the robbery had already been completed by the time that officers responded to the scene. Further, Booth claims that there were no exigent circumstances here because there was no emergency. (Doc. 20 at 7–10.) This Court disagrees.

The Ninth Circuit, as well as other circuits, has upheld "exigent circumstance searches based on officers finding physical evidence of a burglary, such as a broken window or forced lock." *Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995), *abrogated on other grounds by United States v. Ramirez*, 523 U.S. 65, 69–70 (1998); *see also United States v. Valles-Valencia*, 811 F.2d 1232, 1236 (9th Cir. 1987) (finding warrantless entry justified in light of report of possible burglary, inexplicable existence of several men at the home, and signs of forced entry); *United States v. Dart*, 747 F.2d 263, 267 (4th Cir. 1984) (finding warrantless entry justified when signs of burglary were evident and officer had reason to believe perpetrator could still be on premises); *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973) (upholding warrantless entry when responding officers found door ajar and evidence that it had been forced). This is because "[n]ormally, when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance." *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th

Cir. 2006). Accordingly, "[s]o long as the officers have established probable cause for a burglary," the exigencies inherent in the situation entitle the police to "enter immediately, using all appropriate force." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014) (internal quotation marks and citation omitted).

As has been discussed above, the Court finds that there was probable cause to believe that a burglary was either in progress or recently accomplished. Moreover, the Court does not share Booth's conviction that Byykkonen had ensured that whoever had committed the burglary was not still lurking within the house. Byykkonen did no more than "stick his head in" and yell "hello." There is ample reason that Byykkonen limited the exposure of his profile in such a manner and stopped short of walking through the home himself—he had no idea who might be inside and could reasonably assume that if the suspect were confronted, he would either flee or offer armed resistance. This creates an exigent situation. The exigency of which is aptly evidenced by the fact that Nava ensured that the officers had made sure no one remained in the home before she went in. It need not be stated, but the exigency would vanish if it were known with certainty that whoever had committed the burglary had been seen leaving the scene. That is not the case here, where the person who witnessed the break-in had fled and remained

unknown and the reporting neighbor could not be sure whether anyone remained in the home. All that was known was that someone had been seen forcibly entering Booth's residence but that no one had been seen leaving the residence.

Booth argues that the fact responding officers did not ask Byykkonen for "contact information for the landlord and/or Mr. Booth" before entering the residence and conducting a protective sweep indicates that there "was clearly no exigency." (*Id.* at 7–8.) The Court cannot agree with this logic. If anything, this evidence again shows that there were exigent circumstances because the officers did not waste time getting contact information before entering the home and ensuring there was not an individual inside who might either attack or flee. It appears absurd to suggest that officers responding to the scene of a burglary would refrain from ensuring that the perpetrator was not still on the scene to gather contact information for the owner of the home or his landlord. The officers could not know that the "burglary was already a *fait accompli*" without entering the residence to ensure that the perpetrator had left. (*Id.* at 8.) And, again, Byykkonen could not provide this certainty that would allow the responding officers to pause and collect this type of information.

For this same reason, the Court finds that applying for a search warrant was equally impracticable. The officers could not know whether the crime was

ongoing without checking the residence to confirm that the perpetrator had left. To stop and apply for a warrant while there was the potential that the burglar remained in the home and could either flee or aggressively respond to the presence of police officers could have exposed the police officers to unnecessary personal risk or provided the perpetrator an opportunity for escape. Burglary is a crime that carries an inherent risk of violence, which should not be ignored when it is unknown whether the perpetrator is still on the scene. *See James v. United States*, 550 U.S. 192, 203–04 (2007) ("The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party— whether an occupant, a police officer, or a bystander—who comes to investigate."). In short, the immediacy of the situation would have made the application for a search warrant irresponsible.

The Court finds that the entry into Booth's home was supported by probable cause and exigent circumstances. Nonetheless, before concluding, it is worth addressing Booth's argument that the officers went beyond the scope of the permissible search in this case.

Booth couches this argument in his alternative theory argument—posed prospectively in case the United States were to try to justify the search under the

"protective sweep" exception to the search warrant requirement. (Doc. 20 at 11.) The Court need not address the applicability of the protective sweep exception because the Court has already found the search justified under the exigent circumstances exception. Moreover, the protective sweep exception is applicable to searches made incident to arrest. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Here, there was no arrest.

However, Booth goes on to argue that "the officers went beyond the scope of their protective sweep by opening drawers and moving clothes, specifically in the bedroom closet, where: a) given the closet's small dimensions, no person could have hidden; and b) Mr. Booth's clothes were hung up across the width of the closet thereby blocking any 'plain view' of the closet shelf where the two Glock cases or the AR-15 were located." (Doc. 20 at 13.) Booth then alleges that the officers had to have opened the drawer holding the loose cash mentioned in the report. (*Id.* at 13–14.) Although Booth presents these assertions under his protective sweep argument, they would be equally applicable to the search this Court finds was justified under the exigent circumstances exception.

The search justified by the exigent circumstances described above would be for the perpetrator of the burglary and, accordingly, would only permit searching those areas where the perpetrator could be hiding. Although the dimensions of the

drawer in question have not been presented, a drawer would seem to be unlikely place for a burglar to hide. But the factual assertions presented by Booth, including that the drawer had been "closed at the time the officers initiated their protective sweep," are unsupported and run contrary to the only factual evidence before the Court, the reports written by both Officers Stovall and Adams. (Doc. 20 at 13.) In relevant part, Officer Stovall's report states:

> As we made it into the northern most bedroom which was blue in color and had mens clothes all over the floor, we checked on the north side of the bed and as I turned around I saw two Glock pistols and an[ ] AR-15 rifle sitting on a shelf in the closet. There were also several AR-15 magazines sitting halfway out of a safe next to the firearms.

(Doc. 20-2 at 2.) While Officer Adams' report states that "[w]hile clearing the residence, I observed two Glock pistols and an AR15 rifle in the upstairs bedroom in a closet. I also observed multiple one[-]dollar bills in a dresser and [on the] floor of the bed room." (Doc. 20-3 at 2.)

Booth conjectures that the officers had to have moved clothes aside in the closet and opened drawers. Although Booth undoubtedly knew the condition of his bedroom before leaving for the day, interceding circumstances—a burglary—may have altered that condition. And, more importantly, the officers who responded to the scene and were searching the home for a burglar noted that the items in question were in plain view. Officer Stovall does not report having to

-14-

move clothes aside, nor even particularly searching the closet, he only states that he "turned around" and saw the guns in the closet. Officer Adams notes that the money was strewn about the floor and in a dresser drawer, he does not note that he was opening drawers. Certainly, it would seem that having one's personal belongings misplaced or strewn about the home could be expected subsequent to a burglary. This is precisely what was reported by the two officers who witnessed the condition of the home immediately after the burglary, notwithstanding Booth's bald assertions of fact to the contrary.

Based on the foregoing, the Court finds that the officers had probable cause to search for a burglar within Booth's residence and that exigent circumstances made the postponement of that search for a warrant impracticable. Further, the Court finds that the officers did not go beyond the scope of the search that was justified in the circumstances. Accordingly,

IT IS ORDERED that Booth's Motion (Doc. 19) is DENIED.

DATED this 5th day of June, 2019.

*Dana L. Christensen*
Dana L. Christensen, Chief Judge
United States District Court